UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

APRIL CARNEAL,                          )       CASE NO. 5:08CV1562
                                        )
            Plaintiff,                  )       MAGISTRATE JUDGE
                                        )       GEORGE J. LIMBERT
      v.                                )
                                        )
MICHAEL J. ASTRUE,                      )       **MEMORANDUM OPINION**
Commissioner of Social Security,        )       **AND ORDER**
                                        )
            Defendant.                  )

      April Carneal ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue
("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her
applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").
ECF Dkt. #1.  For the following reasons, the Court AFFIRMS the Administrative Law Judge's
("ALJ") decision and DISMISSES the instant case in its entirety with prejudice:

I.    **PROCEDURAL AND FACTUAL HISTORY**

      On March 29, 2002, Plaintiff filed an application for DIB.  Tr. at 47-49.  Plaintiff's
application was denied initially and on reconsideration. Tr. at 30-41. On July 20, 2004, ALJ Patrick
Lazzaro conducted an administrative hearing where Plaintiff was represented by counsel. *Id*. at 233
- 250.  At the hearing, the ALJ heard testimony from Plaintiff.  *Id*.  On September 18, 2004, ALJ
Lazzaro issued a Notice of Decision - Unfavorable.  *Id*. at 12-21.  The Appeals Council denied
Plaintiff's request for review.  *Id*. at 5-8.  Plaintiff then filed an appeal, separate from the instant
appeal, in this Court.  *Id*. at 290-308.

      While Plaintiff's appeal was pending in the District Court, Plaintiff filed an new application
for DIB and an application for SSI.  Tr. at 326-328, 570-573.  This new application was denied
initially and on reconsideration.  *Id*. at 310 - 318.

      On January 5, 2007, Plaintiff's original claim was remanded for another administrative
hearing.  Tr. at 290-305.  On July 2, 2007, ALJ Edmund Round conducted an administrative hearing

on the remanded claim and on the new claim.  Tr. at 574-600.  On August 24, 2007 ALJ Round issued a Notice of Decision - Unfavorable.  *Id*. at 261-275.  The Appeals Council denied Plaintiff's request for review.  *Id*. at 251-253.

 On June 27, 2008, Plaintiff filed the instant suit seeking review of ALJ Round's decision.  ECF Dkt. #1.  On October 7, 2008, Plaintiff filed a brief on the merits.  ECF Dkt. #14.  On January 23, 2009, Defendant filed a brief on the merits.  ECF Dkt. #16.  On January 26, 2009, Plaintiff filed a reply.  ECF Dkt. #17.

**II.      SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

ALJ Round found that Plaintiff suffered from the following severe impairments: obesity, resulting in back pain and knee pain; psychiatric factors affecting physical condition; a generalized anxiety disorder; post traumatic stress disorder; and a depressive disorder NOS.  Tr. at 266-267.

The ALJ then found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. at 267.  The ALJ reasoned that no treating or examining physician opined that Plaintiff satisfied the severity requirements of any listed impairments.  *Id*.

With regard to obesity, the ALJ noted that Plaintiff had only intermittent complaints of low back pain, was never provided with dietary restrictions or placed on a weight loss program by her treating physician, and does not require ambulatory assistance.  Tr. at 267.

Turning to Plaintiff's mental conditions, the ALJ found that Plaintiff's mental impairments did not satisfy the "paragraph B" criteria.  Tr. at 267.  More specifically, the ALJ found that Plaintiff had moderate restrictions in activities of daily living because she could bathe and dress herself, but spent most of her days watching television while her husband did the cooking and shopping.  *Id*.  The ALJ found Plaintiff to have moderate difficulties in social functioning because she was involved in an abusive marriage, diagnosed with PTSD, and experienced homicidal ideation and depression.  *Id*. at 268.  The ALJ found Plaintiff to have moderate difficulties with concentration, persistence, and pace.  *Id*.  The ALJ reasoned that Plaintiff had depression, PTSD, and memory lapses.  *Id*.  He noted that Plaintiff experienced no episodes of decompensation.  *Id*.  The ALJ reasoned that there is no evidence that Plaintiff's symptoms increase or are exacerbated to the extent that she is unable

-2-

to function, and, although she has been hospitalized, she has not required a more structured psychological setting on intensive treatment. *Id.* Based on the foregoing, the ALJ found the"paragraph B" criteria were not satisfied.

The ALJ also found that the "paragraph C" criteria were not satisfied. Tr. at 268. The ALJ reasoned that Plaintiff does not require a highly supportive living arrangement in order to function. *Id.* The ALJ also noted that there is no indication that Plaintiff is unable to function outside of her home, and she testified that she routinely visits her physician and she drives. *Id.*

The ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform a range of light work. Tr. at 268. Specifically, the ALJ found that Plaintiff can sit, stand, and/or walk for 6 hours each during an 8-hour workday and can lift, carry, push, and/or pull 10 pounds frequently and 20 pounds occasionally. *Id.* The ALJ found that Plaintiff is limited to simple, routine, low-stress tasks that are not performed in public and that involve only limited and superficial interaction with supervisors and coworkers. *Id.* The ALJ found that she is precluded from tasks requiring arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others. *Id.*

The ALJ summarized Plaintiff's complaints from the administrative hearing. Tr. at 269-270. He noted that she sees Dr. Trump for treatment of depression, PTSD, anxiety, and a herniated disc in her back. *Id.* at 269. Plaintiff testified that she had herniated a disc in her back 24 years ago and she has difficulties walking, doing laundry, cooking, and washing dishes. *Id.* She testified that she could drive, but only if she needs to do so. *Id.* Plaintiff also testified that she is being treated for high blood pressure and edema. *Id.* at 270. She takes Vicoden, but the side effects make her drowsy and cause migraines. *Id.* She takes Wellbutrin, Effexor, and Xanax for anxiety, but she claims that the Xanax makes her drowsy. *Id.* Plaintiff testified that she does not believe that she can work due to incontinence that occurs two to three times daily. *Id.* The ALJ noted that Plaintiff stated she is incontinent of stool and urine and her doctor thinks that she has an irritable bowel. *Id.* Plaintiff testified that she goes to the bathroom 20 times daily and has not had a normal bowel movement in at least 3 months. *Id.* Lastly, Plaintiff stated that she had a hard time dealing with men because she had been abused by her ex-husband. *Id.*

The ALJ found that Plaintiff's impairments could be expected to produce her alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely credible. Tr. at 270. The ALJ reasoned that the evidence does not fully support Plaintiff's testimony. *Id*. The ALJ additionally noted that there is evidence of malingering, manipulation, and exaggeration that minimizes her credibility pertaining to her symptoms and resulting limitations. *Id*. The ALJ supported this conclusion with a review of the medical evidence. *Id*. at 270-273.

The ALJ first considered a consultative examination by Frederick Leidal, Psy.D. Tr. at 270. Dr. Leidal observed that Plaintiff traveled to the office independently, without assistance. *Id*. at 270. Dr. Leidal noted that Plaintiff cried throughout her examination and that she exaggerated many of her symptoms. *Id*. Dr. Leidal specifically noted that Plaintiff complained of disc problems, but he observed her posture and gait to be normal. *Id*. Additionally, Plaintiff stated that her appetite was poor, but Dr. Leidal noted that her weight was 175 pounds at a height of 5 feet 4 inches. *Id*.

The ALJ stated that the results of the Minnesota Multiphasic Personality Inventory-2 ("MMPI") provided further evidence of Plaintiff's exaggeration. Tr. at 270. The ALJ reasoned that the test revealed a profile suggesting psychological distress, dissatisfaction with life, moodiness, anxiety, irrational thinking, and possibly bizarre mentation. *Id.* Dr. Leidal interpreted the results: as follows  "the profile is so exaggerated that the basic scales would be considered invalid for normal interpretation and suggest the patient may be malingering, or at least partially malingering." *Id*. Dr. Leidal went on to say that "[t]his may be an attempt to exaggerate existing symptoms to the point that some type of secondary gain or external incentive might be a motivation." *Id*. The ALJ noted that Dr. Leidal opined that patients with this type of response on the MMPI have psychiatric problems that are characterological and need to be seen as sick, ill, or dependent because they either feel that they cannot cope with life stress, they do not want to work, or they feel that they need benefits. *Id*. The ALJ noted that Dr. Leidal diagnosed Plaintiff with dysthymic disorder, psychological factors affecting physical condition, and a personality disorder with borderline, histrionic, and immature features. *Id*. Dr. Leidal assigned a Global Assessment of Functioning ("GAF") of 59, indicating moderate, tending toward mild symptoms. *Id*.

The ALJ also pointed to an emergency room visit at Barberton Hospital on November 19, 2003, where Plaintiff complained of feeling "wired" and unable to sleep.  Tr. at 271.  On physical examination, Timothy Billups, M.D. wrote that "[t]he patient is clearly manipulative and, in fact, I believe is actually a borderline personality disorder."  *Id*.  Dr. Billups discharged her and instructed her to resume taking the medications that she had stopped taking on her own.  *Id*.  Dr. Billups also described Plaintiff's behavior as manipulative and immature on May 5, 2003.  *Id*.

The ALJ noted that, in 2002, David Moskovitz, M.D. provided psychiatric treatment at Portage Path Behavioral Health for Plaintiff's complaints of anxiety and depression.  Tr. at 271.  Dr. Moskovitz noted that Plaintiff was very angry secondary to abuse from her ex-husband, but there were no psychotic symptoms present and she was not actively suicidal.  *Id*.  He diagnosed a generalized anxiety disorder, PTSD, depression, and cocaine abuse in sustained remission, and he consistently rated her GAF at 60, indicating moderate tending toward mild symptoms.  *Id*.

The ALJ noted that Plaintiff's condition improved with medication, but there was also evidence that she was non-compliant with her prescriptions because she reported stopping her medication after feeling better, but her non-compliance with medication resulted in reoccurrence of her symptoms.  *Id*.

On June 16, 2005, Robert Dallara, Jr., Ph.D. performed a psychological evaluation at the request of the Bureau of Disability Determination.  Tr. at 271.  On examination, Dr. Dallara diagnosed depression and anxiety disorder, assigned a GAF of 55, and opined that Plaintiff had greater than mild psychological limitations.  *Id*.

The ALJ noted that Plaintiff started seeing Monica Weber, LISW, at Community Health Care for her complaints of depression and her psychological needs because she was dissatisfied with the treatment she was receiving at Portage Path.  Tr. at 271.  The ALJ noted that Kristin Trump, M.D., also of Community Health Care, treated Plaintiff for several years for her complaints of back pain, diarrhea, and family stressors.  *Id*. at 272.  On January 29, 2002, Plaintiff was started on Bentyl for loose stools, but there was no mention of diarrhea during subsequent appointments in 2002, with the exception of listing Lomotil as medication.  *Id*.  The ALJ noted that there were no antidiarrheal medications noted in 2003 and there was no indication of incontinence, frequent diarrhea, or

gastrointestinal problems.  *Id*.  In fact, the ALJ noted that Plaintiff stopped taking Lomotil on her own.  *Id*.

The ALJ described Dr. Trumps treatment notes as being more focused on Plaintiff's psychological and social issues than her medical problems, despite her receiving counseling with Ms.Weber.  Tr. at 272.  The ALJ reasoned that Dr. Trump often described Plaintiff as teary and agitated.  *Id*.  In 2004, Dr. Trump noted complaints of diarrhea and back pain, but the majority of her documentation centered on Plaintiff's psychological problems.  *Id*.  The ALJ noted that Dr. Trump's references to back pain, urinary incontinence, and bowel incontinence were often brief and she made no referrals to other specialists.  *Id*.

The ALJ noted that Plaintiff testified that she experienced uncontrolled diarrhea since November of 2001 and wore pads secondary to bowel incontinence.  Tr. at 272.  Plaintiff testified that she uses the bathroom twenty times a day, and the ALJ concluded that " it is only reasonable to expect that her treating physician would mention if not emphasize that she had incontinence. However, Dr. Trump failed to indicate the presence of incontinence despite noting her history of diarrhea in a letter addressing her medical problems."  *Id*.  The ALJ reemphasized that there were no prescribed antidiarrheals in 2006-2007.  *Id*.

The ALJ then addressed a letter from Dr. Trump on June 11, 2007, where she opined that Plaintiff is  "much too emotionally and medically unstable to participate in a work environment, for any length of time."  Tr. at 272.  The ALJ stated that Dr. Trump's records do not support this conclusion because there was no evidence of an in-depth discussion or analysis of Plaintiff's problems.  *Id*.  Further, the ALJ noted that Dr. Trump is a family practitioner and accordingly gave her opinion of Plaintiff's emotional stability limited weight.  *Id*.  He noted that Dr. Trump was a passive listener to a litany of emotional and psychological complaints.  *Id*.

Turning to Plaintiff's physical impairments, the ALJ concluded that Dr. Trump relied solely upon Plaintiff's statements suggesting that she is disabled.  Tr. at 272.  The ALJ reasoned that Plaintiff complained of frequent diarrhea and testified that she went to the bathroom twenty times daily, but laboratory tests were done by Dr. Trump, and none of them showed evidence of dehydration or electrolyte imbalance to support the amount of fluid loss that one would expect.  *Id*.

-6-

The ALJ further noted that Plaintiff's weight increased, rather than the decrease that would be expected secondary to the rapid fluid loss from frequent diarrhea. *Id*. at 272-273.  The ALJ also discounted Dr. Trump's opinion that Plaintiff could not work due to a herniated disc in her back because Plaintiff did not have an MRI conducted. *Id*. at 273.  The ALJ acknowledged that Plaintiff could not afford to have an MRI taken, but he questioned Dr. Trump's diagnosis of a herniated disc based solely on Plaintiff's statements, rather than on diagnostic studies. *Id*.  For example, the ALJ noted that Dr. Trump did not perform musculoskeletal examinations, such as straight leg raising, heel toe walking, or sensory testing. *Id*.

Upon concluding his review of the medical evidence, the ALJ afforded Dr. Leidal's opinion substantial weight because his specialty as a psychologist is the identification of behavioral problems and because he observed behavior indicative of malingering and exaggeration. Tr. at 273. The ALJ afforded less weight to Dr. Dallara's opinion that Plaintiff was no more than mildly impaired because he found it to be inconsistent with other psychiatric evidence. *Id*.

Lastly, the ALJ turned to Dr. Lesyk's opinion from the administrative hearing. Tr. at 273. He noted that her opinion was that Plaintiff's limitations are volitional and the record shows that manipulation is involved. *Id*.  Dr. Lesyk testified that Plaintiff could work an 8-hour day 5 days a week if she wanted to, but she does not want to do. *Id*.  The ALJ found Dr. Lesyk's opinion to be consistent with Dr. Leidal's opinion and the other evidence. *Id*.  Therefore, he afforded Dr. Lesyk's opinion great weight. *Id*.

The ALJ then went on to find that Plaintiff was not able to perform her past relevant work as a home health aide or as a medical secretary. Tr. at 273.  The ALJ did find, however, that there are jobs in significant numbers in the national economy that Plaintiff can perform. *Id*. at 274.  The ALJ reasoned that the vocational expert opined that a hypothetical worker of Plaintiff's age, education, work experience, and RFC could work in a number of occupations, including housekeeper, office helper, and file clerk. *Id*.  Accordingly, the ALJ found that Plaintiff is not disabled. *Id*.

## III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to

disability insurance benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).  Substantial evidence is more than a scintilla of evidence, but less than a

-8-

preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters*, 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## V. ANALYSIS

### I. Whether the ALJ properly assessed Plaintiff's credibility

Plaintiff first contends that the ALJ failed to properly evaluate her credibility concerning her statements that she could stand for only a few minutes at a time and that she suffered from frequent spells of diarrhea. ECF Dkt. #14 at 9.

### A. Plaintiff's credibility relating to her ability to walk and stand

Plaintiff points to her testimony that she could stand only for about 2 minutes and could walk only the distance from the social security agency's parking area to the hearing office, which is approximately 100-150 yards. *Id.* Plaintiff reasons that the ALJ improperly discredited this testimony because he relied on a one-time consultative examination by a psychologist who found that her gait and posture were normal. *Id.* at 11. Plaintiff challenges the ALJ's reliance on Dr. Leidal's observation of a normal gait on the ground that he is not the type of medical professional who is trained to evaluate physical problems. ECF Dkt. #14 at 11. Plaintiff fails to point the Court to any authority for this proposition. In fact, courts and the medical profession have acknowledged that mental disorders can lead to motor dysfunction. *See*, *e.g.*, *Trostel on Behalf of Murray v. Bowen*, 695 F.Supp. 1418, 1421 (E.D.N.Y.,1988) (rejecting the Secretary's argument that a psychologist and not a psychiatrist trained in medicine; the court held that a treating psychologist's opinion on a neurological impairment was entitled to controlling weight). For example, the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") provides that abnormal gait is a diagnostic criterion for several mental disorders, including Rett's Disorder, Dementia, and Alcohol Intoxication. *See, e.g.,* DSM-IV-TR at 77 ("Diagnostic criteria for 299.80 Rett's Disorder . . . (4) appearance of poorly coordinate gait or trunk movements"); at 161 (diagnostic criteria for 290.4x Vascular Dementia include gait abnormalities); at 215 ("Diagnostic criteria for 303.00 Alcohol Intoxication: . . . (3) unsteady gait"). Psychologists, such as Dr. Leidal, use the

DSM-IV-TR to diagnose mental illness.  *See* DSM-IV-TR at xxiii.  Plaintiff has failed to establish that psychologists lack training in detecting gait abnormalities.  Rather, in the Court's experience, consultive examiners regularly comment on the issue.  The DSM-IV-TR verifies that psychologists are at the very least trained to detect the presence of an abnormality in a patient's gait.  Therefore, the ALJ did not err in relying upon Dr. Leidal's observation that Plaintiff had a normal gait.

Plaintiff further contends that treating source records contain multiple complaints and findings of leg edema and swelling, but the ALJ failed to mention how this swelling would affect Plaintiff's ability to stand and walk.  *Id.*  The Court first notes that this argument does not appear to relate to credibility, and consequently appears to be out of place.  Accordingly, the Court is not entirely sure of the basis of Plaintiff's argument.

Out of caution, the Court will address both potential arguments.  First, the Court perceives that Plaintiff is arguing that the ALJ failed to address the limiting effects of Plaintiff's leg swelling – an argument unrelated to credibility that Plaintiff has mistakenly placed in the credibility portion of her brief.  The Court fails to see any error in this regard.  Having reviewed Plaintiff's testimony from the administrative hearing, the Court finds that Plaintiff never claimed she had difficulty walking due to edema or leg swelling, although, she did state that she experienced edema due to her hypertension.  *See* Tr. at 579-585, 586-587.  Turning to Dr. Trump's opinion letter, the Court finds that Dr. Trump states only that Plaintiff "**has had** problems with edema."  Tr. at 568-569 (emphasis added).  Dr. Trump's opinion letter fails to quantify any limiting effect from these symptoms and states that it is a past condition, without offering a prognosis relating to the likelihood of it manifesting again in the future.  Further, upon review of Dr. Trump's treatment notes, the Court sees no indication of a limiting effect from these symptoms.  The mere assertions that Plaintiff experiences edema and swelling are insufficient to entitle her to benefits.  Dr. Trump's treatment notes provide an excellent example as to the reason. On August 1, 2008, Dr. Trump noted that Plaintiff's edema was "trace," which would indicate that it was not severe.  Tr. at 525.  She made no comment as to a limiting effect.  *Id.*  On June 5, 2006, the notes indicate that Plaintiff's legs were "tree trunk" size over the weekend, but this note was under the "subjective" section of the notes and Dr. Trump did not note any measurements, making it difficult to glean from the record how much

swelling Plaintiff actually experienced.  *Id.*  On November 21, 2006, Plaintiff's lower extremities were not even examined, yet Dr. Trump noted that Plaintiff had no edema.  *Id*. at 519. While there are other portions of Dr. Trump's records that refer to pitting edema  (*see, e.g.,* 446, 471), neither Plaintiff nor her treating physician alleged limiting effects from leg swelling or edema.  Therefore, the Court fails to see this as a basis for finding an error in the ALJ's decision.

Next, the Court perceives that Plaintiff could be arguing that the ALJ erred in discounting her credibility relating to her claims relating to disabling effects of edema and leg swelling since this argument is advanced under the credibility heading of her brief.  As discussed in the foregoing paragraph, however, neither Plaintiff nor her treating physician alleged limiting effects from leg swelling or edema. Therefore, the ALJ could not have erroneously discounted Plaintiff's credibility on the issue and the Court sees no cognizable argument requiring further analysis.

## B.  Plaintiff's credibility relating to her mental impairments

Plaintiff goes on to argue that the ALJ indicated that the consultative examination suggested malingering, but there are insufficient reasons to speculate that this malingering "transferred over to Carneal's physical problems."  ECF Dkt. #14 at 11.  Plaintiff then tangentially argues that the emergency room physician found that Plaintiff had a personality disorder that made her manipulative; however, "if manipulation is part of a medical impairment, like a personality disorder, than [sic] said manipulation should have been included in the ALJ's RFC."  *Id*.  Keeping in mind that Plaintiff limited the scope of her argument to matters of credibility pertaining to her incontinence and the ability to stand and walk (*see* ECF Dkt. #14 at 9), the Court will nevertheless address the issue.

It is true that Dr. Billups diagnose borderline personality disorder and opined that Plaintiff is manipulative.  Tr. at 192.  Regardless, Plaintiff's argument lacks merit because the ALJ thoroughly discussed Dr. Billups' opinion and the RFC that he set forth accommodates a person with a manipulative personality.  First, Dr. Billups did not express an opinion that Plaintiff's manipulation would interfere with her activities of daily living, and he did not articulate the degree to which they would interfere with her ability to work.  Plaintiff fails to appreciate that a diagnosis alone does not necessitate a finding of disability.  It is well established in the Sixth Circuit that a

mental impairment diagnosis standing alone is insufficient to establish entitlement to disability benefits. *Anderson v. Sullivan*, 911 F.2d 731 (Table), 1990 WL 116539 at *7  (6th Cir. 1990) unreported; *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir.1988).  "An individual must establish that the condition is disabling." *Id*.

Regardless, the RFC in this case is compatible with some degree of mental limitation.  The ALJ found that Plaintiff can perform simple, routine, low-stress tasks that are not performed in public and that involve only limited and superficial interaction with supervisors and coworkers.  Tr. at 268.  The ALJ further limited Plaintiff from tasks requiring arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.  *Id*.  The Court fails to see how these restrictions are inconsistent with a diagnosis of borderline personality disorder or manipulative behavior – Plaintiff has pointed the Court to no other evidence indicating that her manipulative personality requires a more restrictive RFC.

Plaintiff goes on to argue that the ALJ improperly considered her credibility pertaining to her mental symptoms because she "never testified concerning her mental symptoms." ECF Dkt. #14 at 12.  At this point, Plaintiff's argument becomes very difficult to follow.  Plaintiff contends:

> In fact, Carneal never testified concerning her mental symptoms.  Moreover the ALJ never specifically stated that he was discrediting any mental health testimony.

ECF Dkt. #14.  The Court fails to understand how Plaintiff can assert that the ALJ erred in discrediting testimony that she allegedly never proffered, and then go on to assert that the ALJ erred in failing to specifically address the issue of credibility on mental health testimony – either Plaintiff testified about her mental health issues or she did not.  If she did testify about them, then the Court must consider whether the ALJ erred in his assessment of credibility on the issue.  If she did not testify about them, then the ALJ could not have erred in failing to specifically state that he was discrediting testimony pertaining to Plaintiff's mental impairments.

Plaintiff's assertion that she "never testified concerning her mental symptoms"is simply not true.  Plaintiff testified that she went to the hospital for depression and anxiety and she promised to return if she experienced any further homicidal or suicidal ideations.  Tr. at 582.  She also testified that she could not work due to her mental stress:

-12-

Q:      Do you believe you could work?

A:      No.

                            *        *        *

Q:      What other reason?

A:      I have a hard time dealing with me[n] because of my abuse in the past.[1]

Tr. at 583.  In asserting that she could not work due to this symptom, Plaintiff did put her credibility regarding her mental impairments at issue.  Despite Plaintiff's contention that the ALJ failed to specifically address the issue of credibility pertaining to mental impairments, the ALJ specifically identified Plaintiff's difficulty in dealing with men as one of the symptoms for which he was discounting her credibility.  Tr. at 270.  Accordingly, the ALJ was justified in relying upon Dr. Leidal's opinion of malingering, which was supported by a MMPI test.  *See id*. at 270, 122-123. Plaintiff's assignment of error in this regard is dismissed.

### C.      Plaintiff's credibility relating to her incontinence and diarrhea

Plaintiff contends that the ALJ erred in discounting her credibility related to her incontinence and diarrhea based upon records from 2002 and 2003.  ECF Dkt. #14 at 12.    Plaintiff points the Court to more recent records, where her physicians noted complaints of incontinence and diarrhea. ECF Dkt. #14 at 12 citing Tr. at 159, 163, 184, 458, 463, 474, 558, 568.   Plaintiff's argument is not persuasive for two reasons.  First, many of those records do not speak to the severity or limiting effects of the conditions; they only acknowledge that the conditions were present: "when sitting will leave puddles - has gone to wearing pads." (Tr. at 458); "diarrhea and urine leakage still there" (Tr. at 474, 558).  Secondly, where the records do speak to the severity of Plaintiff's conditions, they rely on her subjective complaints, and therefore necessarily rely on her credibility.  At page 465 of the transcript, Dr. Trump noted that Plaintiff was "leaking urine all the time" and "having more diarrhea - related to stress,"   but these notes were under the subjective portion of her report, not in the objective section.  Further, none of the records show that Plaintiff informed Dr. Trump that she was

---

[1]      Apparently there is a typographical error in the transcript because the ALJ's decision refers to the Plaintiff's assertion that she had a difficult time dealing with men, not a "difficult time dealing with me."  *See* Tr. at 270.

using the bathroom at least 20 times a day, as she testified at the administrative hearing.  *See* Tr. at 585 (regarding Plaintiff's testimony); *see also* Tr. at 272; 147-179; 227-231; 438-484; 490-492; 511-566 (regarding Dr. Trump's treatment notes).  Accordingly, the ALJ's assessment of Plaintiff's credibility on the issue is essential to the determination of the case, and the Court should defer to his assessment, if it is supported by substantial evidence.  *See Chandler v. Commissioner of Social Sec.*, 124 Fed.Appx. 355, 358, 2005 WL 430325  (6th Cir. Feb. 23, 2005), unreported ("[M]any of Claimant's medical evaluations are based largely on his subjective complaints of pain. Insufficient objective medical evidence makes credibility a particularly relevant issue and this Court will generally defer to the Commissioner's assessment when adequately supported.").

Here, the ALJ's credibility assessment is supported by substantial evidence.  As a momentary digression, the Court first notes that the ALJ improperly opined that Plaintiff's medical records do not show the evidence of dehydration or electrolyte imbalances that would be expected of a person using the bathroom with the frequency that Plaintiff alleged.  This opinion was improper because there was no medical opinion of record to offer support.  *See McCain v. Director, Office of Workers Compensation Programs*, 58 Fed.Appx. 184, 193 (6th Cir. 2003) quoting *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) ("By independently reviewing and interpreting the laboratory reports the ALJ impermissibly substitute[s] his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence.").

Notwithstanding, other evidence supports the ALJ's ultimate conclusion that Plaintiff's claims were not entirely credible.  He noted that it would be reasonable to expect Dr. Trump to address Plaintiff's incontinence in her opinion letter  in light of Plaintiff's claim that she wears pads secondary to bowel incontinence.  Tr. at 272.  Despite advocating complete disability, Dr. Trump's letter, however, makes no mention of incontinence and offers no opinion as to a limiting effect from incontinence.  *Id*. at 568-569.  Further, the evidence of Plaintiff's malingering, manipulation, and tendency to exaggerate her symptoms, addressed above, also supports the ALJ's decision to discount Plaintiff's credibility related to all of her symptoms.  The ALJ stated that "The evidence does not fully support Ms. Carneal's Testimony.  Moreover, there is  evidence of malingering, manipulation and exaggeration that minimizes the credibility of her alleged symptoms and limitations."  Tr. at

270.   As discussed above, objective testing supported Dr. Leidal's findings of malingering. Accordingly, the Court finds that the ALJ's decision to discount Plaintiff's credibility in regard to her allegations of incontinence and diarrhea was supported by substantial evidence.

Plaintiff further claims that the ALJ should not have discredited her testimony due to a lack of medical treatment.  ECF Dkt. #14 at 12-14.  Plaintiff contends that Dr. Trump prescribed Lomotil for diarrhea, but it was unclear why the ALJ found "that Lomotil was apparently an unacceptable form of diarrhea medicine."  *Id.* at 12-13.  The ALJ did not state that Lomotil was an "unacceptable form of diarrhea medicine."  *See* Tr. at 272.  The ALJ acknowledged that Plaintiff was taking Lomotil to treat diarrhea.  *Id.* citing Tr. at 147-163.  Therefore, Plaintiff's argument is not well-taken.   Plaintiff next contends that "[a]lthough the ALJ discredits Carneal because her doctor failed to refer her to a GI Specialist, he failed to fully consider the implications in the record in which she noted she was unable to afford certain treatment."  ECF Dkt. #14 at 13 citing Tr. at 474 and 544.  Plaintiff's argument is not compelling.  The ALJ's discussion of Dr. Trump in this regard was directed at the weight he was affording her medical opinion and not directed at the issue of Plaintiff's credibility.  The ALJ stated:

> Despite counseling received at Community HealthCare by Ms. Weber, documentation by Dr. Trump was more focused on Ms. Carneal's psychological and social issues rather than her medical problems.
>
> *          *          *
>
> This was also apparent in 2004, when Dr. Tump saw Mrs. Carneal.  Although Dr. Trump documented complaints of diarrhea and back pain, the majority of her documentation centered on Mrs. Carneal's psychological problems. Although Dr. Trump made notations regarding Mrs. Carneal's back pain, urinary and bowel incontinence; her documentation was often brief and without referral to other specialist [sic].  While testing may have been limited due to finances, Mrs. Carneal saw Dr. Trump regularly from 2002-2007.
>
> *          *          *
>
> Thus, even though Dr. Trump is the treating physician, her documentation is not supportive of *her opinion and is not afforded more than limited weight*.

Tr. at 272-273 (emphasis added) (internal citations omitted).  Based on the foregoing, the Court finds that the ALJ relied upon the lack of referral to a specialist in order to discount Dr. Trump's opinion, rather than to discount Plaintiff's testimony as she contends.  Therefore, Plaintiff's

-15-

argument is not well-taken.

Lastly, Plaintiff contends that the ALJ erred in discounting her complaints based on Dr. Trump's failure to mention incontinence in her June 11, 2007 letter. ECF Dkt. #14 at 13. Plaintiff reasons that other portions of Dr. Trump's records note incontinence. *Id*. As discussed above, those records are unpersuasive because they are based on Plaintiff's subjective complaints and, for the most part, they do not quantify Plaintiff's incontinence or the resulting limiting effects.

For the foregoing reasons, the Court finds that the ALJ's credibility determination regarding Plaintiff's incontinence and diarrhea was supported by substantial evidence.

**II.        Whether the ALJ properly evaluated Dr. Trump's opinion**

Plaintiff contends that the ALJ erred in discounting Dr. Trump's opinion based upon the lack of objective testing because Plaintiff was unable to afford certain tests and because Plaintiff suffered from irritable bowel syndrome, a condition for which no objective test exists. ECF Dkt. # 14 at 14-15. Plaintiff further contends that Dr. Trump was the only medical doctor who was capable of assessing how Plaintiff's back pain and edema would affect her ability to work. *Id*. at 15. Plaintiff concludes that the lack of a contradicting opinion from a physical consultative physician placed the ALJ in the position of having to inappropriately use his own medical knowledge for rejecting Dr. Trump's medical conclusions. *Id*. citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The Court disagrees with this assertion because Dr. Trump's opinion was not adequately supported and the ALJ articulated sufficient reasons for rejecting his opinion.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). Accordingly, if that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case

-16-

record." *Wilson,* 378 F.3d at 544. "The determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, she must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

Here, Plaintiff's incorrectly argues that the ALJ cannot discount Dr. Trump's opinion in the absence of another medical opinion. Even in the absence of another medical opinion, Dr. Trump's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and must not be "inconsistent with other substantial evidence in [the] case record." *See Wilson*, 378 F.3d at 544. In this case, Dr. Trump's opinion was inconsistent with other evidence of record – specifically, Plaintiff's own testimony. As discussed above, the ALJ's decision to discount Plaintiff's testimony was supported by substantial evidence. Therefore, the ALJ also properly discounted Dr. Trump's opinion based upon Plaintiff's subjective complaints.

-17-

The Court will first address Plaintiff's irritable bowel syndrome.  Upon Plaintiff's own admission, there is no objective test for irritable bowel syndrome.  If there is no objective test upon which to base a diagnosis, then Dr. Trump had to rely solely on Plaintiff's subjective complaints. Since "The determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician," the Court must rely on the ALJ's assessment of Plaintiff's credibility as to the extent of the limiting effects of the symptoms. *Warner*, 375 F.3d at 390 quoting *Harris*, 756 F.2d at 435.  Therefore, Plaintiff's argument that the ALJ erred in rejecting Dr. Trump's opinion is not persuasive; the ALJ was justified in rejecting Dr. Trump's opinion because, as discussed above, the ALJ properly discounted Plaintiff's credibility related to her symptoms.  If the ALJ were forced to accept Dr. Trump's opinion, which was based solely on subjective complaints, then he would be stripped of the important role of determining a claimant's credibility.  This result is certainly not intended by the treating physician rule.  If Dr. Trump's opinion had some clinical basis beside Plaintiff's subjective complaints, then it may have been entitled to more weight.  Since Dr. Trump's opinion was based solely on Plaintiff's own complaints and the ALJ properly discounted those complaints, the Court sees no error in the ALJ's decision to discount Dr. Trump's opinion.

Even if there is no objective test to diagnose irritable bowel syndrome,  the Court and the Commissioner are concerned with Plaintiff's *symptoms* when dealing with the issue of disability and Dr. Trump made no mention of objective symptoms that would limit Plaintiff's ability work.  As previously discussed, Dr. Trump noted Plaintiff's diarrheal symptoms under the "subjective" heading of her reports, which indicates that they were based on Plaintiff's own complaints rather than first hand observations.  And as previously discussed, the ALJ properly discounted Plaintiff's credibility related to her symptoms.  Accordingly, the ALJ properly discounted Dr. Trump's opinion as inconsistent with other evidence of record – Plaintiff's own testimony.

Turning to Plaintiff's alleged herniated disc, the ALJ properly discounted Dr. Trump's opinion as being inconsistent with other evidence of record.  As discussed above, Dr. Leidal observed that Plaintiff had a normal gait during a psychological evaluation, and the Court finds that the ALJ did not err in relying upon Dr. Leidal's observation that Plaintiff had a normal gait.  As the ALJ noted, Dr. Trump's records lack any clinical observations indicative of objective signs of back

-18-

pain or clinical testing.  *See* Tr. at 272 (ALJ's decision);  Tr. at 147-179; 227-231; 438-484; 490-492; 511- 566 (Dr. Trump's notes).  The ALJ noted that Dr. Trump "diagnosed a herniated disc based on Mrs. Carneal's statements alone rather than diagnostic studies."  Tr. at 273.  The Court agrees.  One of the most extensive references to Plaintiff's back pain reveals that Dr. Trump was in fact relying on Plaintiff's subjective complaints: "yesterday did laundry - standing to do 6 loads. did not sleep last night due to pain (does not take vicoden at night due to dreams). **feels that there is also a back component to this.** is the right knee - sore in the muscles around it."  Tr. at 458. (emphasis added).  As with her other opinions, Dr. Trump was relying on Plaintiff's subjective complaints in diagnosing Plaintiff's condition.  Therefore, the Court finds that the ALJ relied upon substantial evidence in rejecting Dr. Trump's opinion.

Plaintiff also contends that the ALJ improperly discounted Dr. Trump's opinion on mental health issues, because "[i]f he is going to give the family doctor little weight on mental issues, then he should also be giving a psychologist little weight on physical issues," referring to Dr. Leidal's observation of her unencumbered gait.  ECF Dkt. # 17 at 1.  Plaintiff's argument lacks merit because as discussed above, Plaintiff has failed to demonstrate that Dr. Leidal lacks the requisite training to identify a gait irregularity.  Secondly, the ALJ properly considered the nature of Plaintiff's treating relationship with Dr. Trump and Dr. Trump's field of specialty.  Specifically, the ALJ observed that Dr. Trump's treatment focused on Plaintiff's psychological and social issues rather than her medical problems, despite the fact that she was treating with a licensed social worker in Dr. Trump's office.  Tr. at 272.  Upon review of Dr. Trump's treatment notes, the Court agrees with the ALJ's observations.  *See* Tr. at 272; 147-179; 227-231; 438-484; 490-492; 511- 566.  Turning to Dr. Trump's opinion letter, she focused on Plaintiff's mental health:

> First, Ms. Carneal suffers from major depression and anxiety disorder, for which she has been hospitalized.  However, as she has no insurance, she requests discharge too soon, and then the anxiety of another large medical bill often causes even more anxiety.  One can see the vicious circle this creates.  She has all but isolated herself from the world, leaving her home only occasionally to help with her ailing mother.  She sleeps 10-12 hours per day.  During the remaining 12-14 hours she functions minimally.  Her mood is very labile - very easily moved to tears and/or panic attacks, escalating into shortness of breath.

-19-

Tr. at 568.  This portion of Dr. Trump's opinion is well beyond the ambit of a general practitioner's expertise.  Dr. Trump even noted that Plaintiff attributed her physical impairments to her mental condition: "She has frequent bouts of abdominal pain and diarrhea, which Ms. Carneal attributes to stress."  Tr. at 568.   Comparing Dr. Leidal's  and Dr. Trump's opinions, as Plaintiff asks the Court to do, the Court notes that Dr. Leidal said only that "The patient's posture was normal and upright, and gait was normal and unencumbered."  Tr. at 121.  The ALJ was justified in relying upon Dr. Leidal's statement because it was within the training of a psychologist and it is also a single statement.  In contrast, Dr. Trump's opinion on Plaintiff's mental health symptoms is extensive and well beyond her area of expertise.

The Sixth Circuit has addressed this very issue in *Pasco v. Commissioner of Social Sec.*, 137 Fed.Appx. 828,  2005 WL 1506343 (6th Cir. 2005), unreported.  In *Pasco*,  an ALJ discounted a family physician's opinion that a claimant had extreme and marked limitation from mental impairments.  *Id*. at 837-838, n. 7.  The physician had opined that:

> The patient is impatient. Easily distracted, she can't sit still for a long period of time without moving & pacing. She has lack of concentration, but she maintains good hygiene & appearance. She has a good eye contact but less interaction with people (nurses)-she has poor immediate & short memory. She claims that she was lost coming to my office & she's been here numerous times. She has no set goals for the future when asked about plan.

*Id*. at n. 7.  The Sixth Circuit upheld the ALJ's decision to discount the treating physician's opinion because the ALJ considered the necessary factors: supportability of the opinion, specialization of the treating source, consistency of opinion with the rest of the record.  *Id*.  at 838.  Dr. Trump's opinions reach much deeper into the field of mental health than the physician in *Pasco* did.  Based on the holding in *Pasco* and the ALJ's articulated reasons in this case, the Court finds that the ALJ did not err in affording limited weight to Dr. Trump's opinion.

### III.    Whether the ALJ properly relied on Dr. Lesyk's opinion

Lastly, Plaintiff contends that the ALJ improperly relied on Dr. Lesyk's opinion.  ECF Dkt. #14 at 16.  Plaintiff reasons that Dr. Lesyk's opinion is "very vague and elusive" and "it is difficult to tell whether or not Dr. Lesyk opined that Carneal had a condition which meets the listing of impairments."  *Id*.  Plaintiff explains that Dr. Lesyk said that, if volition counted, she  would meet

the listings.  *Id*.

Plaintiff's argument is misplaced because the ALJ relied on Dr. Lesyk's opinion only in determining Plaintiff's RFC, not in assessing whether she met a listed impairment.  In finding that Plaintiff did not have an impairment or combination of impairments that meets or medically equals a listed impairment, the ALJ reasoned that "[n]o **treating or examining physician** has indicated findings that would satisfy the severity requirements of any listed impairment."  Tr. at 267 (emphasis added).  Dr. Lesyk was a testifying medical expert, not a treating or examining physician.  Therefore, the ALJ did not rely on her opinion in determining whether Plaintiff met a listing.  The ALJ relied on Dr. Lesyk's opinion only in assessing Plaintiff's RFC:

> In Dr. Lesyk's opinion, Mrs. Carneal's limitation are volition and the record shows that manipulation is involved. She testified that Mrs. Carneal could work an 8-hour day, 5 days a week if she wanted to, but she doesn't want to. Based on the consistency of Dr. Lesyk's testimony with Dr. Leidal's opinion and the consistency of her opinion with the other evidence, I give her opinion great weight.

Tr. at 273.  First, the ALJ made this statement in the context of determining Plaintiff's RFC.  *See* Tr. at 268-273.  Second, the ALJ spoke of Dr. Lesyk's opinions on Plaintiff's limitations, her volitions, and her abilities.  These are considerations that are relevant under RFC analysis, but not necessarily under an analysis to determine if Plaintiff met a listed impairment.  Therefore, Plaintiff's contention that it was unclear whether Dr. Lesyk opined that she met a listed impairment is misplaced.

## VI.   CONCLUSION

For the foregoing reasons, the Court AFFIRMS the ALJ's decision.  The instant case is DISMISSED in its entirety with prejudice.


IT IS SO ORDERED.

DATE:  March 20, 2009                                              */s/George J. Limbert*
                                                                              GEORGE J. LIMBERT
                                                                              UNITED STATES MAGISTRATE JUDGE